**CHICAGO, M., ST. P. & P. R. CO. v. KANE.**

Circuit Court of Appeals, Ninth Circuit.
July 15, 1929.

No. 5760.

Murphy & Whitlock, of Missoula, Mont., and R. F. Gaines, of Butte, Mont., for appellant.

Maury, Brown & Maury, of Butte, Mont., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and LOUDERBACK, District Judge.

DIETRICH, Circuit Judge. The appellee, as administratrix, recovered judgment for $4,500 against appellant for the death of Frank P. Kane, who was struck and killed by one of appellant's west-bound passenger trains at Alcazar, Mont., on September 15, 1928. By the assignments and briefs three general questions are submitted for our consideration: (1) Were Kane's relations to appellant and the conditions at the time of the accident such as to bring the case within the range of the Federal Employers' Liability Act? 45 USCA § 51 et seq. (2) Was the evidence sufficient to send to the jury the issue of defendant's primary negligence? (3) Did the evidence warrant submitting to the jury the issue of negligence under the doctrine of the last clear chance? These we discuss in order.

Inasmuch as there is no exact formula to which the first question can be referred, and every case must be adjudged upon its own facts (Cudahy Packing Co. v. Parramore, 263 U. S. 418, 44 S. Ct. 153, 68 L. Ed. 366, 30 A. L. R. 532), it is necessary to state in some detail the circumstances. The accident happened at about 6:30 in the morning. Alcazar is not a town or village, but a remote railroad station, where there are side and passing tracks and a section house. From this point appellant was working an extra gang of approximately 120 men in surfacing and dressing its roadbed. There being no local facilities for boarding and housing the men, provision was made therefor in movable dining and bunk cars, which were set on a side track at the station, and meals were furnished therein by a commissary concern under contract with appellant, by the terms of which the men were to be charged at a specified rate, and at that rate deductions were to be made from their checks and paid to the commissary. There is no question that the track upon which the work was being done was a facility of interstate commerce, and, indeed, appellant concedes that, had Kane actually entered upon the work prior to the accident, he would have been within the protection of the Liability Act. It seems that appellant was adding to the gang from day to day men secured through its employment agencies, and Kane had been so engaged by its agent at Butte.

In charge and under the control of one of appellant's agents he, with five or six others employed in like manner, was taken on board of one of appellant's passenger trains, and without charge was carried to Alcazar, reaching his destination some time in the evening of September 14th. Being advised that six or seven men were being sent for this service, the foreman of the gang was at the station to meet them upon the arrival of the train. They were there directed to get off and carry some camp supplies which had come in on the train to the commissary. Then all were immediately issued blankets and were assigned to their bunks. Apparently both the commissary steward and the night foreman participated in giving these orders and making these assignments. The men were informed of the breakfast hour about 6:45, and that they were to go to work at 8 o'clock. Across three tracks upon the other side of the yard from the bunk and dining cars were the section house, the water supply, and all toilet facilities. Just before the breakfast hour,

868

Kane was struck and killed while he was walking across these tracks in an "angling" direction from the bunk cars for the purpose of going to the toilet. Undoubtedly he was in appellant's employ, and his service was interstate. By the conditions of his employment, he was necessarily on appellant's premises, and was making necessary preparations for the work in which he was to engage an hour and a half later, in a reasonable manner and within a reasonable time. Appellant's contentions seem to be predicated solely upon the consideration that he had not yet lifted a pick or stuck a shovel into the ground. But his employment was definite, and the nature and place of his service for the day were clearly understood. True, the gang foreman might have discharged him before he did any actual work, or might have assigned him to a different kind of work, but such authority with respect to the future he would have at any time over any one of the men, regardless of the length of service of such man in the past.

In contemplation of law, we are of the opinion that, within the principle recognized by us in Lamphere v. Oregon R. & N. Co. (C. C. A.) 196 F. 336, 47 L. R. A. (N. S.) 1, and San Pedro, etc., v. Davide (C. C. A.) 210 F. 870, deceased was employed in interstate commerce at the time of the accident. In support of this decision we may also cite Missouri, K. & T. Ry. Co. v. United States, 231 U. S. 112, 34 S. Ct. 26, 58 L. Ed. 144; Pedersen v. Delaware, L. & W. R. Co., 229 U. S. 146, 33 S. Ct. 648, 57 L. Ed. 1125; St. Louis, etc., v. Seale et al., 229 U. S. 156, 33 S. Ct. 651, 57 L. Ed. 1129; North Carolina R. Co. v. Zachary, 232 U. S. 248, 34 S. Ct. 305, 58 L. Ed. 591; Erie R. Co. v. Winfield, 244 U. S. 170, 37 S. Ct. 556, 61 L. Ed. 1057, Ann. Cas. 1918B, 662; Padgett v. Seaboard Air Line Ry., 99 S. C. 364, 83 S. E. 633, affirmed without discussion of this particular question, 236 U. S. 668, 35 S. Ct. 481, 59 L. Ed. 777. Similarly Baltimore & Ohio R. Co. v. Whitacre, 124 Md. 411, 92 A. 1060; Id., 242 U. S. 169, 37 S. Ct. 33, 61 L. Ed. 228; Phila., B. & W. R. Co. v. Smith, 132 Md. 345, 103 A. 945; Id., 250 U. S. 101, 39 S. Ct. 396, 63 L. Ed. 869; Brock v. Chicago, Rock Island & P. R. Co., 305 Mo. 502, 266 S. W. 691, 36 A. L. R. 891, certiorari denied 266 U. S. 634, 45 S. Ct. 226, 69 L. Ed. 479; B. & O. R. Co. v. Kast (C. C. A.) 299 F. 419, certiorari denied 266 U. S. 613, 45 S. Ct. 95, 69 L. Ed. 468; Moyse v. N. P. R. Co., 41 Mont. 272, 108 P. 1062; Carter v. St. Louis, etc., R. Co., 307 Mo. 595, 271 S. W. 358; Missouri, K. & T. Ry. Co. v. Rentz (Tex. Civ. App.) 162 S.

W. 959; Sanders v. Charleston & W. C. Ry. Co., 97 S. C. 50, 81 S. E. 283; Stool v. Southern Pacific Co., 88 Or. 350, 172 P. 101; Louisville, etc., R. Co. v. Walker's Adm'r, 162 Ky. 209, 172 S. W. 517. Appellant cites numerous decisions, but we do not find any of them necessarily opposed to the view we have taken. Perhaps those most nearly in point are Ill. Cent. R. Co. v. Behrens, 233 U. S. 473, 34 S. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163, and Erie R. Co. v. Welsh, 242 U. S. 303, 37 S. Ct. 116, 61 L. Ed. 319. They both involved the nice distinctions which must often be made where the injured party is engaged in work which may have to do one moment with intrastate and the next with interstate commerce. But Kane's service was by both parties understood to be in interstate commerce, and nothing else.

Upon an analysis of the evidence, we are constrained to the conclusion that, whether defendant's trainmen were negligent and if so, whether such negligence was the proximate cause of the accident, and whether they were at fault under the doctrine of the last clear chance, were questions for the jury. Plaintiff's contentions were and are that the train was going through the station at a speed exceeding 35 miles an hour, that there was a total failure to give any warning signals until the train was within a few feet of deceased, and that no efforts were made to protect him when the engineer should have realized that he was in peril. We have already described the general conditions, and such additional facts as the testimony tended to prove may be stated without attempting to classify them in respect of their bearing, distinctively, upon any one of the several issues. The testimony, in some particulars uncontradicted, and in others conflicting, tended to prove that the engineman knew of the conditions we have described, and that at that hour of the morning the men were likely to be about the station and tracks for the reasons already suggested, in making preparations for the day's work, that the train was moving at a speed of at least 35 miles an hour and that no whistle was sounded or bell rung until it was within a few feet from Kane—"right about on top" of him—whereupon two short blasts of the whistle were sounded, and he jumped as if to escape, but was struck while in such act. The engineman himself testified that, as he approached, but was yet a long distance away, he saw, according to his own estimate, 25 or 30 of the men about the yards, some near the section house, some on the other side near the bunk cars, some on the tracks, "milling around, some going across or

near the tracks on one side and some on the other." When he was some distance away, approximately a quarter of a mile, he saw Kane, angling across the tracks, with his head down, walking in ordinary gait; "he never gave the slightest recognition of having heard the train, either the whistle or the rumble, until just a moment before he was struck." "The whistle," he continued, "on that engine is not as loud as some steam whistles. I do not think it is as loud as the ordinary steam whistle, railroad locomotive." He later stated that the bell was rung, but the testimony was given under such circumstances that the jury might very well have declined to credit it. There was no evidence of any regulation or notice that the men in the gang should keep off the tracks, and, indeed, because of the conditions to which we have referred, they could not avoid crossing and recrossing them.

In short, there was evidence to warrant the jury in finding that appellant had in camp at that station 120 men under conditions where it was necessary for them to cross its tracks in going from the place where they slept and ate for water and for toilet facilities, and returning. At the hour in the morning when the accident occurred, in getting ready for the day's work, they would naturally be passing back and forth. These conditions were known to the engineman; the train approached the station at a speed of at least 35 miles an hour; though he observed 25 or 30 men milling around near and on the tracks when he was a quarter of a mile away, he did not slacken his speed or give warning by bell or whistle; he saw Kane when he was nearly that far off, and observed that he was crossing the tracks with his back toward the train, that he was walking with his head down, and was apparently unconscious of the approach of the train.

■ Presumably Kane did not intend suicide, but whether he failed to take care because, being in pain, he was intent upon his errand, and for that or other reasons he was unconscious of the approach of the train, or assumed that it was on another track, or that it would come in more slowly, we can only conjecture. But, if his negligence be conceded, it would not defeat the action and would operate only to reduce the recoverable damages. 45 USCA § 53; Grand Trunk, etc., R. Co. v. Lindsay, 233 U. S. 42, 34 S. Ct. 581, 58 L. Ed. 838; Kansas City So. Ry. Co. v. Jones, 241 U. S. 181, 36 S. Ct. 513, 60 L. Ed. 943.

■ Appellee does not contend that there is any rule of law limiting the right of a railroad company to run its trains at a high rate of speed. But, as was said by the Supreme Court of Oregon in Stool v. So. Pac. Co., 88 Or. 350, 360, 172 P. 101, 104, "it does not follow that because a high rate of speed is not negligence per se that a high rate of speed may not become negligence under particular circumstances." See, also, Atchison, T. & S. F. Ry. Co. v. Tiefel (C. C. A. 9th) 28 F. (2d) 977.

■ Nor are we unmindful of the rule that generally a locomotive engineer is not bound to slacken his speed upon observing an adult person a considerable distance away walking near or upon the track. Upon its precise definition, some diversity is to be found in the decided cases, but both parties here seem content with this statement of it as found in 2 Thompson on Negligence (2d Ed.) p. 34:

"It is good sense and clear law that a locomotive engineer is not bound to stop his train or slacken its speed on seeing an adult person walking upon or near the track at a considerable distance in advance of the train, appearing to have the use of his faculties and not to be laboring under any mental or physical disability, and where there is nothing in his appearance or conduct to indicate that he will not leave the track in time to avoid injury, or refrain from going on it; but that, after having given sufficient warning by whistle or bell, he has a right to act on the assumption that the trespasser will quit the track in time to save himself from injury, unless the actions of the trespasser or the circumstances in which he is placed, plainly indicate the contrary; and manifestly his right to act upon this assumption is plainer where he has given the statutory or reasonable signals, unless he sees that the signals are being disregarded by the trespasser."

Manifestly upon its application to the facts here which the jury might have found, the rule so stated did not foreclose the question of want of due caution and care on the part of the engineer under the last clear chance doctrine.

■ If, under the circumstances, the speed of the train and the failure to give any warning signals, in combination, constituted negligence, the jury was warranted in finding it to have been the proximate cause of the accident. To the two blasts of the whistle sounded when the engine was but a few feet away from him decedent instantly responded, but it was then too late. Had they been sounded 200, or even 100, feet further away, it is reasonable to assume he would have responded in like manner, and could thus have escaped injury.

Affirmed.

RUDKIN, Circuit Judge (dissenting). As I understand the majority opinion, a railroad employee who happens to sleep and take his meals in a section house, bunk house, or car furnished by the railway company on its right of way is continuously engaged in interstate commerce, even during the hours devoted to sleep. If this be true, a large number of railway employees who make their homes, temporarily or permanently, in quarters furnished by railway companies on their rights of way, are continuously employed in interstate commerce, even though their time of actual employment does not exceed eight or ten hours per day. I do not think that the statute admits of this broad construction, and, if it does, it is of doubtful validity, because employees of railroads, employed in interstate commerce, are under the protection of the state, except while actively engaged in or about the discharge of their duties. I agree with the majority opinion that it was the duty of the trainmen in charge of the train which caused the injury to give timely notice of its approach to the place of the accident, and that failure to give such notice would constitute negligence, but I see no room for the application of the last clear chance doctrine. That doctrine assumes that the trainmen were free from negligence until they discovered the deceased in a place of actual peril, and, when that discovery was made in this case, no human power could prevent the accident in so far as the trainmen were concerned. The verdict was very small in comparison with the loss sustained by the widow, but, small as it is, I regret to say that in my opinion the judgment cannot stand.